J-S16034-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: R.M.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: P.B., NATURAL MOTHER | No. 1798 MDA 2014 |

Appeal from the Decree September 23, 2014
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-8207

BEFORE:  PANELLA, J., OLSON, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED APRIL 15, 2015**

P.B. ("Mother") appeals the final decree entered September 23, 2014, in the Luzerne County Court of Common Pleas, involuntarily terminating her parental rights to her daughter, R.M.B. ("Child").  On appeal, Mother argues the orphans' court erred in finding Luzerne County Children and Youth Services ("CYS") met its burden of proving termination of her parental rights was warranted pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  For the reasons that follow, we affirm.

The facts underlying this appeal are as follows.  Child, born in April of 2012, was placed with a foster family four days after birth.  Mother, who has cognitive limitations,[1] was having difficulty in the hospital responding to the

_____

[1] Mother was diagnosed with an IQ of 60, which places her in the mild mental retardation range.  N.T., 9/22/2014, at 72.

child's cues, and had a bug infestation problem in her apartment.[2] Over the ensuing two and one-half years, Mother consistently participated in parenting sessions, but had difficulty understanding and applying the lessons in her interactions with Child. A mental health assessment in late 2013 revealed a decline in her ability to care for Child from a previous assessment in June 2012. Mother was also unable to maintain a clean and safe home.

On April 21, 2014, CYS filed three petitions seeking termination of the parental rights of Mother, a presumptive father, and a putative father.[3] The presumptive father consented to Child's adoption and voluntarily relinquished his parental rights. Following a hearing on August 4, 2014, the orphans' court entered a final decree terminating the parental rights of the putative father.[4] Thereafter, on September 22, 2014, the court conducted a hearing concerning the termination of Mother's parental rights. The following day, the orphans' court entered a final decree involuntarily

---

[2] David Fedorco, the property manager at Interfaith Heights, where Mother resides, testified that Mother's unit was first infested with bedbugs in December of 2011. *Id.* at 10. The problem was not resolved until July or August 2012 because Mother refused to thoroughly clean the unit, which was required before the pest control company would complete the work. *Id.* at 11. Fedorco also described the smell in Mother's unit as "atrocious" due to animal feces "scattered" over the floor. *Id.* at 19.

[3] No father is listed on Child's birth certificate.

[4] Putative father has not filed an appeal from that decree.

terminating Mother's parental rights to Child pursuant to Sections 2511(a)(2), (5), (8), and (b). This timely appeal followed.[5]

We review an appeal from the termination of parental rights in accordance with the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012).

The termination of parental rights involves a bifurcated analysis, governed by Section 2511 of the Adoption Act.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if

---

[5] Mother complied with the dictates of Pa.R.A.P. 1925(a)(2)(i), and filed, with the notice of appeal, a concise statement of errors complained of on appeal pursuant.

the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007), *citing* 23 Pa.C.S. § 2511.

In the present case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with

an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

In reviewing a termination decree, "[t]his Court may affirm the trial court's decision regarding the termination of parental rights with regard to **any one** subsection of section 2511(a)." *In re M.T.*, 101 A.3d 1163, 1179 (2014) (*en banc*) (citation omitted and emphasis supplied). Because we agree with the orphans' court decision to terminate Mother's parental rights pursuant to subsection (a)(8), we need not address the remaining subsections of the statute. *See In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011).

With respect to subsection (a)(8), this Court has explained:

[I]n order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYS must produce clear and convincing evidence that: (1) [Child] has been removed from Mother for at least twelve months; (2) the conditions which led to [Child's] removal

continue to exist; and (3) involuntary termination of parental rights would best serve [Child's] needs and welfare. "Notably, termination under Section 2511(a)(8), does not require an evaluation of Mother's willingness or ability to remedy the conditions that led to placement of her children."

*In re K.M.*, 53 A.3d 781, 789 (Pa. Super. 2012) (citations omitted). "The relevant inquiry … is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is *imminent* at the time of the hearing." *In the Interest of I.E.P.*, 87 A.3d 340, 345 (Pa. Super. 2014) (citation omitted and emphasis supplied). *See In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013) ("By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities.") (citation omitted).

Once the grounds for termination are proven under Subsection (a), the orphans' court must consider the "needs and welfare" of the child under Subsection (b).[6]

_____

[6] As noted above, a "needs and welfare" analysis is also required under subsection (a)(8):

> [W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*(Footnote Continued Next Page)*

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Furthermore, "[w]e observe that an orphans' court is not required by statute or precedent to order a formal bonding evaluation by an expert." *In re K.M.*, *supra*, 53 A.3d at 791 (citation omitted).

After a careful review of the certified record - including the transcripts from both the August 4, 2014, and September 22, 2014, termination hearings - the relevant statutory and case law, and the parties' briefs, we find the orphans' court comprehensively discusses and properly disposes of Mother's claims on appeal in its opinion. *See* Orphans' Court Opinion, 11/21/2014, at 4-26.

With regard to termination under Subsection (a)(8), the court concluded (1) Child had been removed from Mother's care for more than 12

*(Footnote Continued)* ─────────────

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*) (citations omitted).

- 7 -

months, (2) the conditions that led to Child's placement continue to exist, and (3) termination would best serve Child's needs and welfare. ***See id.*** at 21-22. In particular, the court found: (1) before and during Child's placement, Mother "struggled with maintaining an adequate and clean apartment;"[7] (2) Mother would have been evicted, but for her involvement with CYS to regain custody of Child; (4) Mother's apartment had an "atrocious" smell because of animal feces "scattered all over the floor," and was littered with garbage, including packages of raw chicken stacked several feet high;[8] (5) Mother did not respond to Child's cues in the hospital after birth; (6) between October 2013 and July 2014, Mother completed only three of 14 parenting skill lessons with a family development specialist; (7) Mother was provided with an "Easy Reader" curriculum due to her cognitive limitations, and was still unable to answer questions regarding the material or give proper feedback on what she had learned;[9] (8) although Mother

_____

[7] Orphans' Court Opinion, 11/21/2014, at 4. Brian Steve, the CYS supervisor, testified that the only reason Mother's home passed the yearly inspection by the Wilkes-Barre Housing Authority in July of 2013, was because Mother's caseworker, from the Nurse Partnership Program, was "directly involved in cleaning the residence." N.T., 9/22/2104, at 106.

[8] Orphans' Court Opinion, 11/21/2014, at 6, 7.

[9] After Mother's first psychological evaluation in June 2012, she was assigned to a case manager in the "developmental disability unit" and provided with materials appropriate for her intellectual level. N.T., 9/22/2014, at 73-74.

acted appropriately with Child during the one supervised visit the parenting specialist observed, the specialist concluded that "Mother cannot safely parent [Child] without the support of agency personnel since Mother cannot identify the safety hazards to her child within a given environment[;]"[10] (10) Mother's psychological evaluation in June of 2012 revealed that (a) Mother had an IQ of 60, which placed her in the mild mental retardation range;[11] (b) Mother "had difficulty using the information from the educational part of parenting and generalizing it to the day-to-day aspects of rearing a child[;]"[12] and (c) Mother suffered from dependent personality disorder; (11) Mother's reevaluation in November/December 2013 revealed her physical appearance had declined and she was withdrawn and lacked energy, but denied having any problems; and (12) significantly, the psychologist, who conducted both evaluations, opined "Mother was not able to safely,

_____

[10] Orphans' Court Opinion, 11/21/2014, at 9.

[11] Clinical psychologist Lenora Hermann-Finn, who conducted the evaluations of Mother, explained that a diagnosis of mental retardation "does not preclude someone from being a good parent." *Id.* at 74. However, generally, a mentally challenged parent requires a good support system, which Mother did not have. Id. at 75. Moreover, Dr. Finn was concerned because Mother struggled to pay attention during her parenting sessions even after the materials had been modified to address her intellectual level. *Id.* at 74.

[12] Orphans' Court Opinion, 11/21/2014, at 10.

adequately and continuously parent a child in 2012 or 2013."[13] The orphans' court concluded:

> Based on the testimony of various witnesses, … and based on the evidence presented to the Court, the Court finds that subsequent to the placement of the child [in April of 2012,] Mother was not able to maintain adequate safe housing for the child due to her inability to keep her home habitable on a continuous basis, in addition to Mother being unable to safely parent [Child] despite her participation in all of the aforesaid parenting programs.  Therefore, the Court finds that Mother has not been able to remedy the conditions that gave rise to the placement of the child.

*Id.* at 14.  *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003) (concluding orphans' court did not abuse its discretion in terminating parental rights of mentally impaired mother; "although the mother was willing to remedy the conditions that led to her children's placement, the mother was not able to demonstrate an ability to provide the basic need of a structured environment for the children[.]").

With regard the needs and welfare analysis under subsection (a)(8), the orphans' court credited the testimony of Mother's CYS caseworkers who concluded:  (1) Mother sometimes appears disinterested in Child; (2) Child is fully assimilated in foster family; (3) the foster parents meet Child's

---

[13] *Id.* at 9-12.  *See id.* at 12-13 (summarizing the services provided to Mother during Child's placement including Nurse Family Partnership Program, Volunteers of America, Community Counseling Services, and Justice Works).

medical and developmental needs; (4) Child has a "strong loving bond" with foster parents;[14] and (5) the foster parents wish to adopt Child. **See** Orphans' Court Opinion, 11/21/2014, at 17-21. Moreover, we note that Child has lived with her foster parents for all but three days of her life. Accordingly, we agree with the determination of the orphans' court that CYS demonstrated termination would best serve Child's needs and welfare under subsection (a)(8).

Furthermore, with respect to the effect termination would have on the "developmental, physical and emotional needs and welfare" of Child under subsection (b), the orphans' court cited the testimony of Mother's caseworker that Mother and Child have a "playmate type of bond and not … a parent child bond."[15] Indeed, Mother's most recent caseworker testified that termination of Mother's parental rights would have no effect on Child. **See also** N.T., 9/22/2014, at 119. The lack of a beneficial bond between Mother and Child, coupled with Mother's sustained inability to provide a safe, structured environment for Child, support the court's subsection (b) analysis. Furthermore, as noted above, Child is strongly bonded to her foster family who provide for her physical and emotional well-being.

---

[14] **Id.** at 18.

[15] **Id.** at 17.

Lastly, the orphans' court considered the testimony of Child's Guardian *ad Litem*, who opined that although Mother has made an effort to engage in programs designed to address her parenting, mental health and housing issues, she has been "unable to show adequate benefit from those programs." ***Id.*** at 136. Rather, as the Guardian *ad Litem* stated, "two years into this process, we are still at the same juncture as we were when this case had begun." ***Id.***

Our review reveals the orphans' courts factual findings are supported by the record. Accordingly, we detect no abuse of discretion on the part of the orphans' court, and affirm the order terminating Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511 (a)(8) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/2015

- 12 -

IN THE INTEREST OF       :    IN THE COURT OF COMMON

             :    PLEAS OF LUZERNE COUNTY

R.M.B.           :    ORPHAN'S COURT DIVISION

             :

A Minor          :    NO. A-8207

             :

             :    1798 MDA 2014

RECORDED
11/21/2014 2:58:52 PM
JUDICIAL SERVICES & RECORDS
LUZERNE COUNTY
PENNSYLVANIA
Inst Num:    201456069

## MEMORANDUM ISSUED PURSUANT TO PA.R.A.P. 1925(a)

### I. PROCEDURAL HISTORY

On April 21, 2014, Petitioner, Luzerne County Children and Youth Services (Children and Youth), filed Petitions for the Involuntary Termination of Parental Rights of the natural father (Father), the putative father, and the natural mother (Mother) for the minor child, R.M.B.

The first hearing was held on August 4, 2014, with testimony and evidence offered pertaining to the natural father and the putative father with a second hearing held on September 22, 2014 with testimony and evidence offered pertaining to the natural mother. The hearings addressed the natural father's voluntary relinquishment of parental rights, the putative father's involuntary termination of parental rights and the involuntary termination petition of the natural mother. This Court issued decrees terminating the parental rights of the natural Father, the putative father, and the natural Mother on September 23, 2014.

Particularly, Mother's parental rights were terminated pursuant to 23 Pa.C.S.A. § 2511(a)(2), §2511 (a) (5) and §2511 (a)(8). In entering the termination

decrees, the Court gave primary consideration to the developmental, physical, and emotional needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(b).

On October 22, 2014, Mother, by and through her Court-Appointed Counsel, filed a Notice of Appeal to the Superior Court and the requisite Statement of Matters Complained of on Appeal. Mother's Statement of Matters Complained of on Appeal is as follows:

1. The Trial Court erred in finding that Children and Youth Services proved the elements of termination with respect to 23 Pa.C.S.A. §2511 (a)(2), 23 PA.C.S.A. §2511 (a)(5), 23 PA.C.S.A. §2511 (a)(8) and 23 PA.C.S.A. §2511 (b), through clear and convincing evidence.

2. There was insufficient evidence presented at trial to establish that the conditions which led to the removal or placement of the child continued to exist and that the termination of parental rights would best serve the needs and welfare of the child.

3. Appellant reserves the right to amend the instant document within a reasonable time after receipt of the transcript.

II. **FINDINGS OF FACT**

There is one minor child in this case. R.M.B. was born on April 1, 2012, and she is currently two (2) years old. It is unrebutted that the minor child has been in placement in foster care as of four (4) days after her birth, namely April 5, 2012. R.M.B. was placed due to parenting, mental health and housing.

In meeting its requisite burden of proof by clear and convincing evidence regarding the termination of parental rights of Mother, Petitioner offered the testimony of Mark Werger, caseworker for Children and Youth; Rebecca Willis,

2

caseworker for Children and Youth; Brian Steve, case supervisor for Children and Youth; Dr. Lenora Herrmann-Finn, expert in the field of clinical psychology; David Fedorco, property manager at Interfaith Heights in Wilkes-Barre, PA; and Grace Tavaris, family development specialist at Family Service Association.

III. **CONCLUSIONS OF LAW**

After consideration of the credible evidence as summarized above and more detailed below, the Court concludes:

(1) Children and Youth has shown by clear and convincing evidence that the parental rights of the Mother to the minor child, R.M.B., should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(2), 23 Pa.C.S.A. Section 2511 (a)(5) and 23 Pa.C.S.A. Section 2511 (a)(8).

(2) Children and Youth has shown by clear and convincing evidence the termination of the parental rights of the Mother, to the minor child, R.M.B., best serves the needs and welfare of the child pursuant to 23 Pa. C.S.A. Section 2511(b).

IV. **DISCUSSION: GROUNDS FOR TERMINATION FOR MOTHER**

The statute permitting involuntary termination of parental rights in Pennsylvania, 23 Pa. C.S.A. Section 2511, sets forth the certain irreducible minimum requirements of care that parents must provide to their children. A parent who cannot or will not meet the requirements within a reasonable time following the intervention by the State may properly be considered unfit and may properly have his or her rights terminated. *In Re: J.T. and R.T.*, 817 A.2d 505 (Pa. Super. 2002).

3

Termination of parental rights is an issue of constitutional dimensions because of the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met. *Santosky v. Kramer*, 455 U.S. 745 (1982), *In Re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). However, as the Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: J.A.S., Jr.*, 2003 Pa. Super. 112, *citing In the Interest of Lillie*, 719 A.2d 327 (Pa. Super 1998).

A.     23 Pa. C.S.A. Section 2511 (a)(2)

A Court may terminate parental rights under Section 2511(a)(2) when:

> The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well being and the conditions of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

Accordingly, Mother's parental rights to the child, R.M.B., can be terminated under Section 2511(a)(2) of the statute. Clear and convincing evidence at the termination hearing was presented to show that Mother struggled with maintaining an adequate and clean apartment for a period of two years, in addition to Mother failing to benefit from the instruction in the parenting programs which would enable her to safely parent R.M.B. Unfortunately, Mother has delayed cognitive skills which impair her ability to safely parent her child despite the parenting programs in which she participated. In addition, Mother's

4

home was inhabitable, filthy and infested with cockroaches and/or bed bugs which was a repeated and continued incapacity throughout the period of the child's placement. As a result of Mother's lack of ability to parent R.M.B. and her inability to maintain adequate and stable housing for the child, Mother is unable to provide the proper and essential care for R.M.B. that is necessary for R.M.B.'s well being.

Brian Steve, case supervisor for Children and Youth testified that R.M.B. was born on April 1, 2012. At the time of her birth, Mother was having difficulty caring for R.M.B. while Mother was in the hospital. Mother did not respond to the baby's cues, such as cries, or even know when the baby needed to be fed. There was also concern about Mother's housing in that Mother's residence was infested with cockroaches and she was in the process of being evicted. N.T.8/4/14 at 25..

Mark Werger, case worker for Luzerne County Children and Youth was assigned to the case since July 17, 2014. (N.T. 9/22/14 at 5, 115) Mr. Werger testified that R.M.B. is two (2) years old and that she was placed on April 5, 2012 with her foster parents, Wade and Diane McRoy. The child was never in the natural mother's physical custody outside of the hospital setting. The child was placed due to concerns with parenting, mental health and housing . (N.T. 9/22/14 at 6, 120)

David Fedorco testified that he is employed by multifamily management in Philadelphia through which he manages the apartment complex knows as Interfaith Heights in Wilkes-Barre, PA. He testified that Mother has been a resident at Interfaith Heights for approximately three (3) years. He further

5

testified that Mother's unit has been infested with bed bugs twice, both in December 2011 and in the spring of 2014. According to Mr. Fedorco, Mother was given instructions and literature on how to clean up her apartment in order to remove the bed bugs; however, Mother failed to comply. N.T. 09/22/14 at 9-11

Furthermore, in order for a pest control company to remove the bed bugs, Mother was required to clean up the apartment. Unfortunately, Mother was not able to do so for a period of six (6) months after being requested. Mr. Fedorco testified that Mother's apartment was filthy. Mother had pet cats whose feces were scattered all over the floor. She also had other animals such as a salamander, iguana and gerbil in the apartment which contributed to the filth in the apartment. Mr. Fedorco stated that Mother's apartment was not fit for human habitation. According to Mr. Fedorco, Mother's apartment also had an "atrocious" smell. Mr. Fedorco also testified that they were getting complaints from the residents regarding the smell from Mother's apartment. *Id.* at 14, 19.

In December of 2011, a pest control company was not able to remove the bed bugs because Mother's place was too filthy. The Interfaith Apartments had to hire another pest control company to attempt to remove the bed bugs from Mother's apartment eventhough the apartment was not clean. *Id.* at 11, 19. Mr. Fedorco testified that the Interfaith apartments would have evicted Mother much sooner had the court not been involved in this matter. Mr. Fedorco testified that they were trying to be patient with the Mother in light of her situation with the court. *Id.* at 20. Mother was also told many times that she must remove the cats from the apartment; however, Mother did not comply. *Id.* at 19.

6

Mr. Fedorco testified that he believes that Mother brought the infestation to the apartment and because Mother does not keep her place clean, it was too difficult to remove the bed bugs. *Id.* at 23. Mr. Fedorco further testified that there was garbage everywhere in Mother's apartment and chicken packages were piled up on top of the garbage several feet high. *Id.* 23, 34. Mr. Fedorco testified that while Mother resided at Interfaith apartments for approximately three (3) years, she only passed inspection once. All remaining inspection reports indicated that Mother's apartment did not pass inspection due to the filth, bed bugs and clutter in her apartment. Based upon Mother's history and living conditions at the apartment, Mr. Fedorco believed that Mother cannot adequately maintain the apartment on a continuous basis so that it is fit for human habitation for herself and her daughter. *Id.* at 20, 36.

Grace Tavaris testified that she is employed by Family Service Association as a family development specialist. Her job involves providing parenting skills and parenting knowledge to parents through the nurturing parenting curriculum. The curriculum is accomplished by providing weekly sessions, conducting a pre-test to determine the status of the parent and a post-test upon the completion of the curriculum. *Id.* at 39-41 The parents are expected to complete fourteen (14) lessons in the program. Mother only completed three (3) lessons. *Id.* at 55-56,

Ms. Tavaris testified that she worked with Mother between October 2013 and July 2014. Mother was given the pre-test in October of 2013 which showed that Mother needed to work on certain areas such as empathy, child development, power and development, child and family roles. *Id.* at 42. Ms. Tavaris testified that Mother had certain limitations. She was given lessons from

7

the Easy Reader for the Nurturing Parenting curriculum geared toward parents with disabilities. According to Ms. Tavaris, Mother was not able to address questions that pose safety issues to R.M.B., nor was Mother able to answer questions from the material she learned or give adequate feedback. *Id.* at 45-46.

Ms. Tavaris testified that she was not able to meet with the Mother at the office on a weekly basis because Mother's home was infested with bed bugs and Mother had lice. *Id.* at 43. Ms. Tavaris testified that she was also not able to meet with Mother out in the community instead of the office because Mother had to be first cleared from the infestation and lice by a physician. *Id.* at 62-63. Mother also cancelled at times and was not able to attend a session. In addition, Mother was pregnant and never informed anyone of her pregnancy. Therefore, Mother missed the opportunity to receive lessons regarding her prenatal care. *Id.* at 54. Mother gave birth in mid-June to her second child and was not able to complete any additional sessions. *Id.* at 54, 58. Thus, Mother was not able to complete the curriculum.

Ms. Tavaris was only able to observe one visit between the Mother and the subject child. Although Mother was able to change the child's diaper and read to the child, Ms. Tavaris was not able to observe any additional visits to insure that Mother can be consistent. Furthermore, Ms. Tavaris testified that other aides were present to help Mother with the child if needed. Based on Ms. Tavaris' observation of the visit between Mother and the child and based on Mother's inability to comprehend the material given, Ms. Tavaris concluded that Mother is unable to safely parent R.M.B. without proper supervision. *Id.* at 48-49

8

In July 2014, Mother's parenting instruction was closed upon the recommendation of the community resource specialist and senior community resource specialist as a result of Mother's lack of progress in parenting. *Id.* at 47, 52. Although Mother was able to express love for her child and show concern for her child, she had difficulty understanding the parenting material and was unable to relate the material to R.M.B. *Id.* at 53. According to Ms. Tavaris, although Mother had completed three (3) lessons, she had a difficult time understanding the lessons and giving feedback in those lessons. *Id.* at 56-61. In conclusion, according to Ms. Tavaris, in working with Mother, Ms. Tavaris believes that Mother cannot safely parent R.M.B. without the support of agency personnel since Mother cannot identify the safety hazards to her child within a given environment. *Id.* at 63-64

Dr. Lenora Hermann Finn, qualified as an expert in the field of clinical psychology, testified that she conducted two separate assessments on Mother. Dr. Finn conducted her first assessment in June of 2012 and the second spanning the months of November and December of 2013. Dr. Finn testified that with respect to the first assessment, she met with Mother on June 5, 2012 and June 25, 2012. On June 5, 2012, Dr. Finn assessed Mother's levels of cognitive functioning. Dr. Finn spent six hours with Mother on June 5, 2012 because Mother had significant reading difficulties; therefore, the reading scales had to be verbally administered. *Id.* at 72. Dr. Finn testified that when assessing Mother's cognitive functioning, Mother tested with an IQ of 60 which falls in the mild range of mental retardation. Furthermore, Dr. Finn also found that Mother's associated thinking moved from the concrete to the abstract. According to Dr.

9

Finn, that poses a problem in Mother benefitting from the parent education programs. Dr. Finn testified that Mother had difficulty using the information from the educational part of parenting and generalizing it to the day-to-day aspects of rearing a child. Dr. Finn further indicated that Mother's verbal-social judgment and applied-social judgment were deficient. Thus, Mother was given a case manager in the development disability unit of the county mental health services department. *Id.* at 72-73.

Dr. Finn testified that she did not administer tools assessing parenting in 2012 as Mother was having structured contact with her child. Upon speaking with parenting education providers, Dr. Finn was told that Mother could parent as long as someone was helping her. Also, the providers struggled with Mother's attention span. Although, Mother was being provided with material geared to her intellectual level, Mother had a difficult time focusing on the material. *Id.* at 74

Dr. Finn testified that Mother also minimized the conditions of her home at the time R.M.B. was placed. Dr. Finn indicated that a parent that is mentally challenged can parent if they have a good support system. However, according to Dr. Finn, Mother does not have a good family support system. According to Dr. Finn, the maternal grandmother is challenged with cognitive delays and medical issues. *Id.* at 75. Dr. Finn found that Mother was exhibiting a dependent personality disorder in which other people guided her behavior. Dr. Finn testified that in 2012, Mother denied all clinical symptoms, denied anxiety and depression and denied anything that was impacting on her functioning. *Id.* at 76. Therefore, in 2012, Dr. Finn diagnosed Mother with having dependant

10

personality disorder and recommended that Mother continue working with her mental health counselor. *Id.* at 76-77.

Dr. Finn in her second assessment of the Mother on November 18, 2013 and December 16, 2013, administered a structured parenting tool since Mother was having more intensive contact with the child. One of the parenting tools determined how much reward a parent receives from the child. Dr. Finn testified Mother viewed herself as unable to manage R.M.B. According to Dr. Finn, Mother did not identify anything in herself that needed to be changed. She saw R.M.B. as having a difficult time with changes. Mother saw her relationship with R.B.M. fluctuating up and down which affected her relationship with the child. *Id.* at 79.

Dr. Finn further stated that when she saw Mother in 2013, her entire physical demeanor had changed. Dr. Finn described Mother's personal hygiene as poor. Mother was withdrawn and kept her winter coat on while indoors. Mother would not maintain eye contact and her body language displayed avoidance. Dr. Finn described Mother's behavior as being very different than in 2012. Dr. Finn was concerned that she saw a decline in Mother's overall presentation from 2012. Dr. Finn further described Mother's level of energy in 2013 as much lower than in 2012. Mother had to be directed more in order to follow her task. Dr. Finn stated that Mother's lack of energy was problematic. *Id.* at 78, 81.

Dr. Finn further stated since R.M.B. had been in the foster home since April 5, 2012, Mother did not view the removal of the child from the foster home as being a problem at all. Dr. Finn stated that Mother was told that R.M.B. had

11

autism but Mother could not understand what that meant. Dr. Finn testified that someone needed to explain to Mother the developmental issues that R.M.B. might have so that Mother can better meet the needs of the child. *Id.* at 81-82.

In 2013, Mother was denying that there were any problems. Mother was defensive and she was dealing with stress by avoiding the existence of any problems. Dr. Finn testified that in 2013, Mother still had individual issues, relationship issues and parenting issues which negatively impacted Mother's ability to safely parent the child.

Dr. Finn further emphasized since Mother has cognitive delays, it is essential that there is a good family support network as well as agencies to help her parent the child. According to Dr. Finn, Mother did not have a good family support network and there was not enough agency support to help Mother. *Id.* at 88.

Therefore, based on a reasonable degree of certainty in her profession, Dr. Finn opined that Mother was not able to safely, adequately and continuously parent a child in 2012 or 2013. Furthermore, Dr. Finn testified that from 2012 to 2013, Mother actually declined in her ability to adequately care for the child. *Id.* at 82-83. Dr. Finn further recommended that any contact between Mother and R.M.B. must be supervised. *Id.* at 95.

Brian Steve testified that he has been the supervisor for Mother's case since June 2012. Mr. Steve summarized for the court the types of services that were offered to Mother. Mother was first involved with a Nurse Family Partnership Program which is a parenting program for first-time mothers. Mother was involved in the program until the child reached two (2) years old.

12

Prior to R.M.B.'s birth, Mother was involved in a parenting support program through Volunteers of America. Mother was involved in that program until December of 2012 when the parenting instructor found the first bedbug infestation in Mother's unit. Then Mother was referred to Time Limited Family Reunification Program, a parenting provider, until Mother's case was closed. Mother was also involved with Community Counseling Services for her mental health treatment. *Id.* at 100-103.

There was also a Nurse Family Partnership program which was an in-home service in which visits were made to Mother's home every two (2) weeks. The program provided parenting skills. Mother worked on changing diapers, feeding schedules, routine safety measures in the home and cleanliness in the home. According to Mr. Steve, Ms. Smallcomb, the worker from the Nurse Family Partnership Program who assisted Mother in cleaning the home, stated that Mother did not successfully complete the program since R.M.B. was already two (2) years old and Mother still could not keep her apartment clean and benefit from the program.

Also, Justice Works was another program which provided supervised visits either at the parents' home or in the community. Mr. Steve testified that Dr. Finn was made aware of all those services. *Id.* at 102, 105.

Mr. Steve also testified that the agency provided Mother with a dumpster service at her prior residence prior to moving into Interfaith apartments. Mother received help to move into her new residence at Interfaith apartments. Mother was given instructions on how to maintain the new residence and keep the

residence clean; however, despite these instructions, Mother was still not able to keep her new residence at Interfaith apartments clean *Id.* at 108-109.

Based on the testimony of various witnesses, summarized above, and based on the evidence presented to the Court, the Court finds that subsequent to the placement of the child on April 5, 2012, Mother was not able to maintain adequate safe housing for the child due to her inability to keep her home habitable on a continuous basis, in addition to Mother being unable to safely parent R.M.B. despite her participation in all of the aforesaid parenting programs. Therefore, the Court finds that Mother has not been able to remedy the conditions that gave rise to the placement of the child.

Unlike 23 Pa.C.S.A. § 2511(a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and . . . this is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." (our emphasis added) *In re E.A.P.*, 944 A.2d 79 (Pa. Super 2008).

Given the overwhelming evidence and testimony, it is clear that Mother has received and/or has been offered extensive services over the years and she has failed to complete and/or benefit from the services.

At this juncture, the child's right to have proper parenting in fulfillment of her potential in a permanent, healthy, safe environment outweighs Mother's

14

interest. *In Re: J.A.S., Jr.*, 2003 Pa. Super. 112, *citing In the Interest of Lillie*, 719 A.2d 327 (Pa. Super 1998).

## V.    DISCUSSION: GROUNDS FOR TERMINATION FOR MOTHER

A.    23 Pa. C.S.A. Section 2511 (a)(5)

A Court may terminate the parental rights under Section 2511(a)(5) when:

The child has been removed from the care of the parent by the Court or under voluntary agreement with an agency for a period of at least six months, the conditions of which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

Mother's parental rights may also be terminated under this provision of the Statute. Under 23 Pa.C.S.A. Section 2511(a)(5), the agency must show: (1) the child has been removed from the care of the parent by the Court for a period of at least six months; (2) The conditions giving rise to placement continue to exist, (3) Those conditions will not be remedied in a reasonable period of time, and (4) Termination of parental rights would best serve the needs and welfare of the child.

(1) CHILD REMOVED BY THE COURT FOR A PERIOD OF A LEAST SIX MONTHS AND CONDITIONS CONTINUING TO EXIST

The child was originally placed on April 5, 2012 due to an emergency shelter care Order issued by the Court. Therefore, the child has been removed from her Mother for at least six (6) months. It is also clear, through the testimony outlined above, that the natural Mother has been unable to resolve the issues that gave rise to the placement of the minor child, R.M.B., i.e. inability to

15

safely and adequately parent the child and inability to maintain safe and stable housing. The overwhelming evidence shows that all of these issues have yet to be remedied by Mother even after participating in mental health treatment and parenting programs.

The Court has recognized this issue above in its analysis of Section 2511(a)(2) and finds the same considerations apply for 2511 (a)(5) that have already been discussed extensively in this memorandum. Furthermore, the Court applies this same reasoning in concluding that the natural Mother failed to remedy the conditions that originally gave rise to placement of his minor child, R.M.B.

### (2) REMEDY OF CONDITIONS IN REASONABLE TIME

Mother has had over two (2) years to remedy the conditions which gave rise to placement, yet the evidence shows that she has been unable to make any progress. The court recognizes that Mother has delayed cognitive skills that impair her ability to parent R.M.B. and/or to benefit from the parenting programs offered to her. In addition, Mother's home was found to be inhabitable. This Court finds that Mother has been and is unable to remedy the conditions that gave rise to placement of the minor child within a reasonable time period.

### (3) NEEDS AND WELFARE OF THE CHILD

The term "needs and welfare" of a child refers to both tangible and intangible needs. The intangible needs of a child include love, comfort, security and closeness. *In re Matsock*, 416 Pa. Super. 520, 611 A.2d 737, 747 (1992). There

16

is nothing in the record that shows that the natural Mother is presently capable of providing a safe, secure environment for the minor child.

Parental duty is best understood in relation to the needs of a child. These needs, both physical and emotional, cannot be met by a mere passive interest in the development of the child. Meeting a child's needs is a positive duty that requires affirmative performance. *In re Shives*, 363 Pa. Super. 225, 525 A.2d 801, 802 (1987).

A parent is not relieved of his or her responsibility relating to the needs of a child when a child has been placed in foster care. A non-custodial parent has a duty to exert himself to take and maintain a place of importance in the child's life. *In re Adoption of M.J.H.*, 348 Pa. Super. 65, 501 A.2d 648 (1985). A parent must demonstrate a continuing interest in the child and make a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975). Moreover, a parent with a child in foster care has an affirmative duty to work toward the return of the child. *In Re: William L.*, 477 Pa. 322, 383 A.2d 1228 (1978).

Mr. Werger, case worker for Children and Youth, testified that he observed some visits between the child and the natural mother at the Children and Youth agency twice per week. During the visits, Mr. Werger testified that the child, many times, played by herself with toys in the corner. The natural mother engaged the child at times, but also appeared disinterested with the child. He testified that the child and the natural mother have a bond; however, he described the bond as a playmate type of bond and not as a parent child bond. *Id.* at 115. Mr. Werger testified that when the foster parents drop off the child at the

17

agency for a visit the child is reluctant to leave them. When the foster parents return to pick her up, the child runs to them smiling calling them "mommy" and "daddy" and not wanting to leave their side. *Id.* at 117. Mr. Werger further testified that the natural mother was introduced to the child as her "mother"; however, the child only refers to her foster mother as "mommy" and no one else. *Id.* at 124-25.

Mr. Werger also testified that he observed the interactions between the child and the foster family on a monthly basis. He testified that the visits consisted of approximately one half-hour. The foster family consists of the child's brother, the foster mother, the foster father, and their two (2) sons. *Id.* at 115. Mr. Werger testified that the child has assimilated into the family. She attends family functions, birthday parties, celebrates the holidays and goes on day trips with the family. *Id.* at 129. During the visits with the foster family, according to Mr. Werger, the child does not ask about the natural mother. *Id.* at 115.

Mr. Werger testified that the foster parents meet the child's physical needs as well as her medical needs. They take the child for medical check ups regularly. They also meet the child's developmental needs. They have the child enrolled in an early intervention program. Mr. Werger testified that there is a strong loving bond between the child and the foster parents. The foster parents tell the child that they love her. They hold and hug the child. *Id.* at 126.

Mr. Werger also explained to the foster parents that by terminating the natural parents' parental rights, the natural parents would no longer have any type of obligations to the child or be financially responsible. If the foster parents adopt the child, the rights, duties and obligation would be on the foster parents

18

for the child. Mr. Werger testified that the foster parents understood and were willing to take on that responsibility. *Id.* at 127-28. Mr. Werger believed that the child would benefit from the foster parents adopting the child since the child would have permanency. Mr. Werger further testified that if the natural parents' parental rights are terminated, the termination would not have a negative effect on the child since the child already believes she is with her parents. *Id.* at 118, 127.

When considering the needs and welfare of the child, it is also important for the court to consider the bond between the parent and the child because severance of a strong parental bond can have a detrimental impact on the child. *Matsock, supra.*

Even if the Court were to consider the bonding between Mother and her child, the Court notes the following language of the Superior Court in Re: K.K.R.-S., 958 A.2nd 529, 535 (Pa. Super 2008).

"A child's feelings toward a parent are relevant to the section 2511 (b) analysis. Nonetheless, concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent it not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding".

In the case *sub judice* the Mother has failed to correct her behavior in her inability to safely parent R.M.B. as well as her inability to maintain safe and stable housing for the child. The overwhelming evidence shows that all of these issues have yet to be remedied by Mother. Accordingly, the Court finds that the

19

termination of Mother's parental rights would best serve the needs and welfare of the child.

Rebecca Willis, caseworker for Children and Youth, also testified that she is familiar with the foster parents. Ms. Willis testified that in 2014, she observed visits between the child and the foster parents, Diane and Wayne McRoy, approximately on a monthly basis. She testified that each visit was approximately one hour.

Ms. Willis also testified that the child has assimilated into the family. According to Ms. Willis, the child is included in all family functions, vacations and church events. Ms. Willis testified that there are individual pictures of her on the wall as well as family pictures. N.T. 10/04/2013 at 39-40.

Ms. Willis testified that the foster parents meet the child's physical needs by providing shelter, food and clothing for the child. They also take the child to doctor visits when needed. Ms. Willis testified that the foster parents also meet the child's developmental needs. They provide the child with age-appropriate toys and games. They take the child to church functions and have the child included with other children her age. In addition, the foster parents are also having the child receive early intervention services to help the child with her speech. The foster parents also meet the child's emotional needs. When the child is sick, tired or crying, they pick up the child and comfort her. The child responds to their comfort. *Id.* at 41-43.

Ms. Willis testified that there is a close bond between the foster parents and a positive attachment between them especially since the child has been with the foster parents since birth. The foster parents also hold out the child as their

20

own to the community. Ms. Willis testified that it is the foster parents' intent to adopt the child. Ms. Willis believes that the adoption would have a positive effect because the child would have permanency through adoption. *Id.* at 43.

Based upon the testimony of Mr. Werger and Ms. Willis, the court finds that the termination of Mother's parental rights would best serve the needs and welfare of the child.

## VI.   DISCUSSION: GROUNDS FOR TERMINATION FOR MOTHER

### A.   23 Pa. C.S.A. Section 2511 (a)(8)

A Court may terminate the parental rights under Section 2511(a)(8) when:

The child has been removed from the care of the parent by the Court or under Voluntary agreement with an agency, twelve (12) months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination would best serve the needs and welfare of the child.

Parental rights may be terminated under this provision of the Statute. Under 23 Pa.C.S.A. Section 2511(a)(8), the agency must show: (1) The child has been removed for at least twelve (12) months, (2) The conditions that gave rise to placement continue to exist, and (3) Termination of parental rights would best serve the needs and welfare of the child.

### (1) TIME PERIOD OF REMOVAL OF CHILD

It is undisputed that minor child, R.M.B., has been removed from the custody of Mother, since April 5, 2012. Accordingly, this removal has persisted well in excess of the statutorily required twelve (12) months since the date of the child's placement. Thus, the requisite minimum of at least 12 months from removal of minor child from Mother has elapsed so as to comply with this section of 2511(8).

## (2) CONDITIONS CONTINUING TO EXIST

The conditions that led to the child's removal from Mother's care and into placement were Mother's inability to safely parent R.M.B. and her inability to provide and maintain safe, stable and adequate housing. The Court has performed the above extensive analysis in taking testimony and finding credible evidence in concluding that Mother failed to derive any benefit from the services. Therefore, the conditions that gave rise to placement continue to exist.

In discussing and finding that Mother's conditions continue to exist, the Court incorporates its reasoning and the testimony of all witnesses already discussed in this Memorandum found in the section addressing 23 PA. C.S. Section 2511 (a)(2).

## (3) NEEDS AND WELFARE OF THE CHILD

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child."

The Court has done this and finds the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the Court applies the same reasoning for concluding that these needs will be served by the termination of Mother's parental rights.

22

## VII.   ADDITIONAL CONSIDERATIONS  UNDER 23 P.A.C.S.A. SECTION 2511(b)

### FOR MOTHER

#### A.   ENVIRONMENTAL FACTORS

Title 23 Pa. C.S.A. Section 2511(b) specifies that a court may not terminate the parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent."

As "environmental factors beyond the control of Mother" was not the linchpin in the placement of the minor child and because of the presence of other, independent factors utilized in the placement of R.M.B., this consideration does not apply and will not be addressed.

#### B.   NEEDS AND WELFARE OF THE CHILD

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." This is to be a separate inquiry and even where the court has already considered the needs and the welfare of the child under one of the grounds of termination, the court must do so again. *In re Matsock*, 611 A.2d 738 (1992).

The Court has done this and finds the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the Court applies the same reasoning for concluding that these needs will be served by the termination of Mother's parental rights.

23

## VIII. ADOPTION AND SAFE FAMILIES ACT (ASFA) CONSIDERATIONS

Recently, the Pennsylvania Superior Court relied upon the Adoption and Safe Families Act (ASFA) in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010). The goal of ASFA was described as follows:

Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*Id.* at 1119-1120 citing *In re G.P.*, 851 A.2d 967, 975-976 (Pa. Super. 2004)

The Court also provided that "above all else . . . adequate consideration must be given to the needs and welfare of the child . . . A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *Id.* at 1121 (internal citations omitted).

In reversing the trial court and terminating the natural parent's parental rights, the Superior Court held:

"ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental incapacity. Z.P. has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification."

*Id.* at 1125-26.

These ASFA-related policies are applicable in the present case of minor child, R.M.B. The child has been in placement since April 5, 201, for approximately two and a half years. Accordingly, a reasonable time of 18 months

24

has long expired to remedy parental incapacity and there is little rational prospect of the timely reunification of R.M.B. to her Mother.

## IX. CONCLUSION

Finally, the Court notes that the Guardian Ad Litem expressed on the record, after having been present for all the testimony and evidence, her belief that the Petitioner has sustained its burden of proof by clear and convincing evidence and that the parental rights of Mother be terminated as it is in the minor child's best interest to be free for adoption. The Guardian Ad Litem emphasized that eventhough Mother showed a desire to participate in the programs and services offered to her, Mother, after two (2) years still was not able to show an adequate benefit from the programs. According to the Guardian Ad Litem, Mother did not show enough progress for R.M.B. to safely go home with her and be independently parented by Mother. N.T. 09/22/14 at 135-136.

This court agrees with the Guardian Ad Litem's position and finds that the Mother cannot offer to her child the basic physical, developmental and emotional needs that her child requires and should have throughout her future life. Mother has been given ample time to address and remedy her problems, but has failed to successfully do so. The Court finds that she is not able to meet her child's needs. In stark contrast, the foster parents have amply demonstrated they meet the physical, developmental and emotional needs of the minor child, R.M.B. and she has thrived under their care. The child needs consistency and deserves a permanent home with loving capable parents. The only way to provide this is to terminate the rights of the Mother. Clearly it is in the child's best interest to do

so.

Respectfully submitted,

BY THE COURT,

_Jennifer L. Rogers_

JENNIFER L. ROGERS                                J.

DATE: 11/21/14

COPIES TO:

Anthony Lumbis, Esquire
Luzerne County Children and Youth
110 N. Penna Blvd.
Wilkes-Barre, PA 18702

Louis J. Mattioli III, Esquire
4285 Hollywood Boulevard
Hazle Township, PA 18202

Danielle Aregood-Shonfeld, Esquire
1218 South Main Street
Hanover Township, PA 18706

Paul Delaney, Esquire
P.O. Box 4315
Wyoming, PA 18644